# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MARCUS LOMAX** | **CIVIL ACTION** |
| **VERSUS** | **NO: 16-17825** |
| **MARQUETTE TRANSPORTATION** | **SECTION "H"** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Marcus Lomax alleges he was injured while working aboard the M/V ROSS SALVAGGIO when he was struck in the face by a grinder while buffing the underside of an overhead deck. He brings claims against his employer Marquette Transportation ("Marquette") for Jones Act negligence, unseaworthiness, and maintenance and cure. This case proceeded to a bench trial on June 18 and 19, 2018. Having considered the evidence admitted at trial and the arguments of counsel, this Court makes the following findings of fact and conclusions of law. To the extent a finding of fact constitutes a conclusion of law, and vice versa, the Court adopts it as such.

# FINDINGS OF FACT

1. At all material times, Marquette was the owner of the vessel the M/V ROSS SALVAGGIO.

2. At all material times, Plaintiff Marcus Lomax, a 46-year-old male, worked for Marquette as a tankerman aboard the M/V ROSS SALVAGGIO.

3. At all material times, the M/V ROSS SALVAGGIO was a vessel engaged in traditional maritime commerce upon the navigable waters of the United States.

4. At all material times, Plaintiff was a seaman and member of the crew of the M/V ROSS SALVAGGIO.

5. Plaintiff had worked as a tankerman for Defendant for several years prior to the accident at issue.

6. In May 2015 prior to the accident, Plaintiff had obtained an apprentice mate license to become a pilot, which allowed him to train under a captain for approximately 18 months in the steersmen program to eventually become a boat pilot. The steersmen program is a selective process and not every tankerman is selected. Participants in Defendant's steersmen program are selected by a board from a list of employees who have obtained an apprentice license based on a variety of considerations. Only about 10 of 100 interested employees are selected at any given time.

7. On May 29, 2015 while working aboard the M/V ROSS SALVAGGIO, Plaintiff was asked to clean rust off of the underside of the fleet deck in order to prepare the area for painting.

8. Plaintiff was injured while using a grinder on the underside of the fleet deck with his arms extended above his head. The grinder hit a rust pocket, he lost control of the grinder, and it fell back and hit his face, knocking him to the ground.

9. Plaintiff's accident was unwitnessed.

10. The grinder that Plaintiff was using at the time of the accident was lost overboard.

11. Fellow tankerman, Henry Scott, was using a 7-inch Dewalt grinder with a T-handle and a face mask to perform the same task prior to Plaintiff's shift.

12. Plaintiff was provided the same grinder and face mask to perform the task.

13. The deck grinder that Plaintiff was using to perform the task was a 7-inch Dewalt D28474 weighing roughly 13 pounds. The grinder was equipped with a T-handle at the time it was provided to Plaintiff.

14. The face mask provided to Plaintiff extended about 2 to 3 inches below the chin.

15. The Court finds the testimony of Robert Borison, an expert in safety and offshore operations, credible. Borison testified that the 7-inch grinder used by Plaintiff was not appropriate for overhead grinding. He opined that it was too heavy and awkward to lift and push the grinder overhead for a period of time. He opined that a smaller weight grinder would have been a more appropriate tool for the task of grinding overhead.

16. Drilling overhead with the 7-inch Dewalt grinder was an unsafe method of work.

17. There were no smaller grinders, such as a Dewalt Model D28402 small angle grinder, available on the vessel for Plaintiff to use. In fact, the crew was not allowed to use smaller grinders.

18. Defendant had previously discontinued use of the smaller angle grinders on its vessels because they turned more RPMs than the wheels were rated for, causing needles and wires to come out of the grinder. Defendant instructed its crews to use only the larger 7-inch grinders.

19. As testified to by Borison, Defendant was negligent in replacing the smaller grinder with a larger grinder instead of fitting the smaller grinder with a cup at the appropriate rated capacity. Such cups were readily available for purchase.

20. Defendant was negligent in failing to provide Plaintiff with a more appropriate tool to complete the task.

21. Even if a smaller grinder was used, a face mask should still be worn.

22. The face mask provided to Plaintiff to complete the task was found after the incident and had no markings or blood on it.

23. As Defendant's marine ergonomic expert Trevor Bardarson testified, if Plaintiff had been wearing a face mask at the time of the accident, the grinder would have hit the mask and it would not have been knocked off. Plaintiff would not have sustained the mouth injuries at issue.

24. Based on the injuries Plaintiff sustained, he could not have been wearing his face mask at the time of the accident.

25. Plaintiff was negligent in failing to wear a face mask.

26. Even if Plaintiff had been wearing a face mask, however, it would not have prevented the accident or prevented him from being knocked to the ground.

27. Plaintiff's failure to wear a face mask was not a cause of the back and neck injuries he sustained in the accident.

28. A needle gun or chipping hammer and brush were available for Plaintiff's use on the vessel. Borison testified that either would have been a more appropriate tool to complete the task assigned to Plaintiff.

29. Plaintiff did not use stop work authority or report having unsafe equipment to perform the task. He also did not seek out a needle gun or chipping hammer despite their availability on the boat.

30. Plaintiff was negligent in failing to use stop work authority or seek out a more appropriate tool for the task.

31. An ambulance was called to assist Plaintiff immediately after the accident.

32. The accident caused extensive damage to Plaintiff's teeth and mouth, resulting in the loss of several teeth, a laceration of the lower lip, and alveolar fractures. Plaintiff underwent dental restoration surgery, including extractions, implants, and bone grafting.

33. Plaintiff's mouth and dental issues were resolved through surgery, but annual dental exams with radiographs are recommended for future care.

34. The accident also caused injury to Plaintiff's neck and back.

35. Plaintiff reported neck and back pain within a few days of the accident.

36. Plaintiff began treating for his back and neck pain within two months of the accident with Dr. William Donovan. An MRI taken 6 weeks post-accident revealed cervical and lumbar disc protrusions, and Plaintiff underwent epidural steroid injections, facet blocks, radiofrequency ablation, and facet joint injections.

37. The Court found the testimony of Plaintiff's treating physician Dr. Bradley Bartholomew, an expert in the field of neurosurgery, to be most credible and compelling.

38. Plaintiff began treating with Dr. Bartholomew in February 2017. Dr. Bartholomew performed two sets of facet blocks with limited results.

39. A cervical MRI performed in February 2017 showed the protrusions had improved but revealed spurring. A lumbar MRI performed on the same date revealed similar findings to the post-accident MRI.

40. Based on the February 2017 MRIs, Dr. Bartholomew recommends a three-level lumbar facet fusion at the cost of approximately $76,200, but he does not feel surgery on the cervical spine is warranted.

41. An EMG/NCS performed on August 1, 2017 was positive for mild right carpal tunnel syndrome, mild/moderate right carpal tunnel

syndrome, left C6-7 radiculopathy and left L4-5 radiculopathy. Dr. Bartholomew recommends braces for the carpal tunnel syndrome.

42. Dr. Bartholomew relates his findings to the accident at issue here to a reasonable degree of medical certainty.

43. This Court adopts Dr. Bartholomew's opinion that Plaintiff can return to work in a sedentary to light duty capacity. He recommends Plaintiff avoid repetitive bending, stooping, crawling, twisting, turning, or picking up more than 25 pounds on a repetitive basis, as to the lower back. As to the cervical spine, Dr. Bartholomew recommends that Plaintiff avoid repetitive flexion and extension, which is looking up and looking down, climbing steep ladders, or working overhead with more than 15 pounds on a regular basis.

44. Due to the inadequate response to the injections and other prior treatment, Dr. Bartholomew recommended a pain management consultation.

45. Plaintiff began treating with Dr. Troy Beaucoudray for pain management in January 2018. Dr. Beaucoudray is qualified in the field of neurology and pain management. Dr. Beaucoudray began treating Plaintiff's neck and back pain with narcotics, muscle relaxers, and anti-inflammatory medications.

46. Based on Dr. Beaucoudray's testimony, Plaintiff reached maximum medical improvement from a neurological pain management standpoint on April 23, 2018 without any further surgical intervention.

47. Dr. Beaucoudray recommends bimonthly office visits at a cost of $215.00 for the foreseeable future to monitor Plaintiff's chronic pain and treatment with controlled substances.

48. Plaintiff reports continued pain in his neck and back, as well as headaches, despite medication and feels surgery will ultimately be necessary. Plaintiff reports pain when standing or sitting too long and exercising.

49. Plaintiff's mother and estranged wife report that he continues to complain about neck and back pain, trouble sleeping, depression, and stress.

50. The private investigator photos and video admitted by Defendant, which show Plaintiff walking, standing, turning, and getting into a vehicle, do not reveal anything about the subjective pain experienced by Plaintiff or his difficulty in performing those actions at the time of the video or otherwise.

51. Plaintiff reports suffering from depression since the accident.

52. In December, Plaintiff began psychiatric treatment and was diagnosed with Post-Traumatic Stress Disorder (PTSD) and chronic pain. However, Plaintiff did not provide testimony at trial supporting a finding of PTSD.

53. The Court finds the testimony of Defendant's psychiatry expert, Dr. Richard Roninger, credible and compelling. He opined that Plaintiff did not have symptoms indicating PTSD. Rather, he exhibits symptoms of somatic symptom disorder centered around his complaints of pain. Dr. Roninger opined that the use of narcotics can

worsen the feeling of depression, cause apathy, and impair energy and concentration. He recommends stopping the use of narcotics to improve Plaintiff's somatic symptom disorder. He also recommends anti-depressants and returning to work.

54. In 2017, Plaintiff earned $71,666.25 annually as a tankerman.

55. Plaintiff's work-life expectancy from the date of the accident is 15.87 years.

56. The Court finds that after reaching maximum medical improvement on April 23, 2018, Plaintiff could have returned to work at light duty making between $14.50 and $19.50 per hour.

57. In 2004, Plaintiff suffered a workplace injury to his right shoulder and kidney. A lumbar MRI done at that time was negative.

58. Plaintiff had previously suffered an injury to his left shoulder playing football.

59. Plaintiff had no prior back injury or pain in the areas at issue here.

60. Defendant has provided Plaintiff with maintenance and cure payments since the accident. There is no outstanding cure remaining. Maintenance payments continued after trial pending the Court's ruling.

## CONCLUSIONS OF LAW

### Jones Act

1. The Jones Act creates a cause of action for negligence when a seaman is injured in the course of his employment. *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 416 (2009).

2. "An employer is liable under the Jones Act if the negligence of its employees played any part, even the slightest in causing the injury or death for which damages are sought. Even so, the Fifth Circuit clarified that the employer's standard of care is not greater than that of ordinary negligence under the circumstances. A Jones Act employer is not an insurer of a seaman's safety; the mere occurrence of an injury does not establish liability." *Stowe v. Moran Towing Corp.*, 995 F. Supp. 2d 570, 575 (E.D. La. 2014) (internal citation omitted).

3. "A Jones Act employer has the duty to provide his seaman employees with a reasonably safe place to work, including providing reasonably suitable gear." *Fluker v. Manson Gulf, LLC*, 193 F. Supp. 3d 668, 674 (E.D. La. 2016)

4. At all material times, Marquette was Plaintiff's employer pursuant to the Jones Act, and Plaintiff held seaman status.

5. The *McCorpen* defense is not applicable to a Jones Act negligence claim. *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 302 (5th Cir. 2008).

6. "Contributory negligence is an affirmative defense that diminishes recovery in proportion to the seaman's fault. To establish that a seaman is contributorily negligent, an employer must prove negligence and causation." *Id.* Under the Jones Act, the reasonable person standard is one of a reasonable seaman in like circumstances. *Id.* "To establish causation, an employer must show that a seaman's negligence played any part, even the slightest, in producing the injury." *Id.* (internal quotation omitted).

7. Defendant was negligent in providing Lomax with the large angle grinder to perform overhead work and for failing to provide Plaintiff with a smaller grinder for the job task.

8. Plaintiff was negligent in failing to use stop work authority or seek more appropriate equipment that was available on the vessel to complete the task.

9. Both Defendant's and Plaintiff's acts of negligence were a cause of the injuries sustained by Plaintiff.

10. Fault is apportioned 75% to Defendant and 25% to Plaintiff.

Unseaworthiness

11. "Independent from a claim under the Jones Act, a seaman has a claim for injuries caused by the unseaworthiness of a vessel under general maritime law. The duty of a vessel owner to provide a seaworthy vessel is an absolute non-delegable duty; the duty imposes liability without fault." *Fluker*, 2016 WL 3346038, at *4.

12. "Unseaworthiness is not a fault-based standard; a plaintiff must show, however, that the unseaworthy condition 'played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.'" *Id.* (quoting *Phillips v. Western Co. of North America*, 953 F.2d 923, 928 (5th Cir. 1992)).

13. "A vessel is unseaworthy only if it presents an unreasonable risk of harm to the seaman. The owner is not obligated to furnish an 'accident-free' ship. Seaworthiness requires only that a vessel and its

appurtenances be reasonably suited for its intended purpose or use." *Patterson v. Omega Protein, Inc.*, 26 F. Supp. 3d 544, 547–48 (E.D. La. 2014) (internal quotations and citations omitted).

14. "[A]n unsafe method of work may render a vessel unseaworthy." *Rogers v. Eagle Offshore Drilling Servs., Inc.*, 764 F.2d 300, 303 (5th Cir. 1985). However, "[t]he mere existence of an alternative method of work or of alternative equipment . . . is insufficient of itself to render a vessel unseaworthy." *Id.*

15. The M/V ROSS SALVAGGIO was unseaworthy. Defendant failed to provide Plaintiff with equipment reasonably fit for its intended purpose of grinding rust spots located above the head. Performing the task with a 7-inch Dewalt grinder was an unsafe method of work.

16. The vessel's unseaworthiness played a substantial part in bringing about Plaintiff's injuries.

17. "[T]he effect of a finding of contributory negligence in an unseaworthiness claim, as in a Jones Act claim, is only to reduce damages proportionately, not to bar the claim." *Fontenot v. Teledyne Movible Offshore, Inc.*, 714 F.2d 17, 19 (5th Cir. 1983)

18. Plaintiff's negligence in failing to use stop work authority or seek out a more appropriate tool for the task also contributed to the injuries he sustained.

19. Fault is apportioned 75% to Defendant and 25% to Plaintiff.

Maintenance and Cure

20. A seaman who becomes sick or injured during his service to the ship is entitled to maintenance and cure. *Cooper v. Diamond M Co.*, 799 F.2d 176, 178–79 (5th Cir. 1986) (citations omitted).

21. "'Maintenance' encompasses a seaman's living expenses, while 'cure' covers payment of medical or therapeutic treatment." *Pelotto v. L & N Towing Co.*, 604 F.2d 396, 400 (5th Cir. 1979) (citations omitted).

22. "Maintenance and cure must be paid by the seaman's employer until the point of 'maximum medical recovery' or 'maximum cure.' Maximum cure is achieved when it appears probable that further treatment will result in no betterment of the seaman's condition, a determination that would be appropriate if the seaman's injury is incurable or future treatment would merely relieve pain and suffering but not otherwise improve the seaman's physical condition." *Alario v. Offshore Serv. Vessels, L.L.C.*, 477 F. App'x 186, 188 (5th Cir. 2012) (internal quotations omitted).

23. "[W]here the shipowner requires a seaman to submit to a pre-hiring medical examination or interview and the seaman intentionally misrepresents or conceals material medical facts, the disclosure of which is plainly desired, then he is not entitled to an award of maintenance and cure*." McCorpen v. Cent. Gulf S. S. Corp.*, 396 F.2d 547, 549 (5th Cir. 1968).

24. To prevail on the *McCorpen* defense to maintenance and cure, "an employer must show that (1) the claimant intentionally misrepresented or concealed medical facts; (2) the non-disclosed facts

were material to the employer's decision to hire the claimant; and (3) a connection exists between the withheld information and the injury complained of in the lawsuit." *Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 171 (5th Cir. 2005).

25. Defendant failed to carry its burden to show the elements of a *McCorpen* defense where Plaintiff's unreported medical facts did not have a connection to the injury complained of in this lawsuit.

26. Plaintiff is entitled to maintenance and cure for the injuries sustained on May 29, 2015 while in service of the M/V ROSS SALVAGGIO until he reached maximum medical improvement on April 23, 2018.

27. Defendant has satisfied its maintenance and cure obligation.

Damages

28. "[A]n injured seaman may recover damages for loss of earnings capacity, future lost earnings, medical expenses, and pain and suffering resulting from his injury." *Pallis v. United States*, 369 F. App'x 538, 544 (5th Cir. 2010).

29. Plaintiff "may not recover the same damages or benefits more than once." Pattern Civ. Jury Instr. 5th Cir. 4.3 (2014).

30. An award of maintenance "is neither a substitute for wages nor is it to be considered in lieu of a seaman's wages, in whole or in part." It is error to deduct maintenance paid from an award of past lost wages. *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 378 (5th Cir. 1989).

31. General damages are available "for pain and suffering and impact on one's normal life routines." *Barto v. Shore Const., L.L.C.*, 801 F.3d 465, 473 (5th Cir. 2015).

32. Plaintiff's damages for past and future general damages for pain and suffering amount to $150,000.

33. The Court holds that a finding that Plaintiff would have received a promotion to pilot is too speculative to support a higher award of lost wages and, instead, bases Plaintiff's award of lost earnings on his salary as a tankerman. *See Pallis*, 369 F. App'x at 544.

34. Plaintiff's damages for past, after-tax loss of earnings from the time of the accident to maximum medical improvement amount to $185,114.

35. To determine lost future earnings, the Court must "estimat[e] the loss of work life resulting from the injury or death, calculat[e] the lost income stream, comput[e] the total damage, and discount[ ] that amount to its present value. [C]alculation of the lost income stream begins with the gross earnings of the injured party at the time of injury." *Mayne v. Omega Protein Inc.*, 370 F. App'x 510, 517 (5th Cir. 2010).

36. Plaintiff's damages for future loss of earning capacity amount to $424,142.19.

37. Plaintiff's damages for future medical expenses amount to $87,000, which includes the recommended facet fusion surgery, continued pain management for Plaintiff's complaints of cervical pain, anti-

depressants, annual dental exams with radiograph, and braces for carpal tunnel syndrome.

## **CONCLUSION**

For the foregoing reasons, Plaintiff is entitled to judgment on his claims for Jones Act negligence, unseaworthiness, and maintenance and cure against Defendant. Taking into consideration his proportion of fault, Plaintiff is entitled to damages in the following amounts:

Past loss of earnings: $138,835.50

Loss of future earning capacity: $318,106.64

Future medical expenses: $65,250

General damages: $112,500

TOTAL DAMAGES AWARD: $634,692.14

New Orleans, Louisiana this 3rd day of January, 2019.

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**